UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Caroline Cieminski,               :   Case No. 1:06-cv-568
                                  :
     Plaintiff,                   :
                                  :
vs.                               :
                                  :
Dave Flaugher, et al,             :
                                  :
     Defendants.                  :

**ORDER**

Before the Court is Defendants' motion for summary judgment. (Doc. 55) Plaintiff opposes the motion (Doc. 70), and Defendants have replied. (Doc. 72) Cieminski alleges she was defrauded when the company she worked for was sold, and she did not receive compensation she had been promised.

**FACTUAL BACKGROUND**

Cieminski works in natural gas sales; she started in May 1997, working for a company called SigCorp. By 2002, Cieminski's compensation (salary plus sales commissions) was on target to reach $400,000 per year. Cieminski left SigCorp shortly after it was sold to another company in May 2002.

Defendants Dave Flaugher, Paul Hutter and Julie Heilwagen owned Defendant Pinnacle Energy, LLC, an Indiana limited liability company. Flaugher and Hutter worked for Duke Energy Corporation in the 1990's, and started Pinnacle as a natural gas marketing company in 2000 or 2001. Heilwagen joined them as a

-1-

minority (5%) owner and an employee.  Flaugher owned 78% of the equity interest in the company.  Pinnacle sold and serviced end-user supply contracts for gas supplied by another company, Noble Energy.  Pinnacle and Noble executed a contract in December 2003, under which Pinnacle received 65% of the gross margin on sales, and Noble received 35%.  According to Flaugher, the 65/35 split was negotiated with Noble each succeeding year, and he believed that Pinnacle would likely receive less in future years due to growing price pressures in the industry.

Cieminski started working for Pinnacle as an independent contractor sales representative in May 2002.  She had two independent contractor agreements with Pinnacle, the first in October 2002 (Doc 55, Exhibit B), and the second signed in August 2004 (Doc. 55, Exhibit C).  Her 2004 contract included her right to receive sales commissions of 32.5% of the "positive difference, if any," between her customer's contract sales price and the "Minimum Authorized Price" determined by Pinnacle.  (Doc. 55, Exhibit C, ¶5)  Her percentage was based on 100% of the total difference, not just upon Pinnacle's 65% share; in other words, for sales made by Cieminski, Noble received 35%, Cieminski 32.5%, and Pinnacle 32.5% of the margin.

Paragraph 12 of her 2004 contract expressed the parties' intent to separately negotiate an agreement concerning Cieminski's "ownership" interest in Pinnacle if the company was

sold. A subsequent agreement Cieminski signed on December 10, 2004 states that if Pinnacle was sold, Cieminski would receive ten percent of the net sale proceeds, and her independent contractor agreement would terminate. The agreement also states that Cieminski's "entitlement to commission fees payable under [her contract] shall also terminate upon completion of such acquisition or merger." (Doc. 55, Exhibit D)

Pinnacle's Sale to BP Canada.

Flaugher was approached by BP Canada Energy Marketing Corp about purchasing Pinnacle sometime in 2004. Negotiations were unsuccessful that year, but apparently resumed in 2005. Pinnacle, Noble and BP Canada eventually reached an agreement that BP would buy Pinnacle's and Noble's interests in the contracts and related assets for a total price of $30 million, plus an additional $2 million to be paid as retention bonuses to key Pinnacle employees who agreed to work for BP after the sale. A November 1, 2005 letter of intent states separate purchase prices for Pinnacle and for Noble. (Doc. 54, Exhibit 2 at p. 3)

The sale had to close by December 31, 2005, and so various due diligence and pre-closing tasks began sometime in late November. One of those tasks was to secure the Pinnacle/Noble customers' consent to the assignment of their gas supply contracts to BP. Flaugher sent an email dated December 1, 2005 to Pinnacle sales agents attaching a proposed consent letter.

-3-

Flaugher stated that Noble would send the letter when it received the go-ahead from the attorneys. Pinnacle sales agents would then have a short time to contact their customers to explain the situation. His email also states: "It is important that our customers realize the urgency of returning the signed letters to Noble in order for us to provide for a seamless operational transition from Noble to BP." (Doc. 69, Exhibit 6)

Almost all of Pinnacle's customers eventually agreed to the assignment of their contracts to BP, and the sale was timely closed. Under the final purchase & sale agreement, Pinnacle was paid $18.8 million and Noble $11.2 million. (Doc. 54, Flaugher Affidavit Exhibit 5) Pinnacle paid Cieminski $1.88 million after the closing was finalized.

Cieminski also accepted an offer from BP Energy and began working for that company after the sale. Her employment agreement had a two-year term, a base salary of $130,000, and a "target" bonus of $75,000. She also was entitled to receive an incentive retention bonus of $100,000 at the end of each of the first two years, plus a package of company benefits and four weeks of paid vacation. (Doc. 55, Exhibit G) Cieminski and BP parted company in May 2006, however, and Cieminski filed a lawsuit against BP that same month. (See <u>Cieminski v. BP Canada Energy Marketing Corp.</u>, S.D. Ohio Case No. 1:06-cv-350.)

<u>Cieminski's Claims in This Case</u>.

-4-

After her termination by BP, Cieminski talked with several people in the industry and heard that the Pinnacle selling price was higher than $18.8 million.  She began to doubt that she had received the 10% share that Pinnacle had obligated itself to pay her under the December 10, 2004 agreement.  Her attorney requested a written accounting of the sale.  When that request went unanswered, she filed a complaint for breach of contract alleging that the sale price was approximately $30 million. (Doc. 1)  The day before her scheduled deposition in June 2007, Cieminski sought leave to amend her complaint to add a claim for fraudulent misrepresentation and to seek punitive damages. She bases her tort claims on her allegation that she had a conversation with Flaugher about the BP negotiations sometime in October 2005, when Flaugher told her she would receive $3 million if the sale closed.[1]

She also alleges that she had another conversation with Flaugher, after Flaugher sent the email concerning customer contract assignments.  She told him she was concerned about asking her customers to execute assignments without knowing "the specifics of when my compensation would be received on the – the equity from the company."  (Cieminski Deposition p. 94:19-24) Flaugher then told her she would be paid $2.2 million at closing.

_____

[1] Flaugher denies making this statement, but for purposes of Rule 56, the Court assumes Cieminski's allegations are true.

When she asked him why the amount was lower than $3 million, Flaugher said they were getting less money for Pinnacle than originally expected.  He also told her that Noble would not continue on with the Pinnacle business.  Cieminski concluded from his statements that her "only option" was to encourage her customers to accept the assignments.  (<u>Id</u>.)

After this conversation, sometime in December 2005, Cieminski was asked to sign a "Waiver Agreement."  She understood this was one of many agreements required to complete the sale. (Cieminski Deposition p. 94:1-7)  Paragraph 1 of the Waiver Agreement states:

> 1.  <u>Termination of Contractor Agreement;</u>
> <u>Waiver</u>.  Subject to the provisions of this
> Agreement, upon the acceptance by [Cieminski]
> of [BP's employment offer], or upon closing
> the sale of all or substantially all of the
> assets of [Pinnacle], which ever date is
> earlier, [Cieminski] and [Pinnacle] shall be
> deemed to have terminated [Cieminski's]
> Contractor Agreement in full compliance with
> the terms of the Contractor Agreement.
> [Cieminski] acknowledges that, by accepting
> [BP's Employment Offer], [Cieminski]
> irrevocably waives [her] right, title and
> interest in and to all Forward Commissions
> and all other rights under [her] Contractor
> Agreement and [Cieminski] discharges
> [Pinnacle] from all obligations to
> [Cieminski] arising from [her] Contractor
> Agreement.

This agreement defines "Forward Commissions" as commissions Cieminski "may be entitled to ... after termination of [her] services with the Company."  Paragraph 2 of the Waiver Agreement

also contains Cieminski's blanket release of any and all claims against Pinnacle relating to her independent contractor agreement. (Doc. 55, Exhibit F)

Cieminski testified that when she was asked to sign the waiver agreement, she told Flaugher and Hutter she felt "like I was being forced to sign a document with very little notice and that I wanted to get legal review on it." They responded that they needed her to sign the document ASAP, and that it had been reviewed by Pinnacle's corporate counsel, Mark Colucci. (Cieminski Deposition p. 168:13-20) Cieminski admitted she had a personal lawyer at the time. Cieminski signed the waiver agreement sometime after her conversation with Flaugher and Hutter; its effective date was December 15, 2005. She does not allege that she did not read or did not understand the agreement. Cieminski then signed the BP Employment Agreement on December 27, 2005.

Defendants' motion for summary judgment (Doc. 53) argues they are entitled to judgment on all of Cieminski's contract and fraud claims. In her response, Cieminski abandoned her breach of contract claim regarding the Pinnacle sale. (Doc. 70, p. 12 n. 38) She argues, however, that Pinnacle breached her independent contractor agreement by miscalculating commissions paid to her before the Pinnacle sale. She also argues she was defrauded out of promised benefits from Pinnacle's sale by Defendants'

misrepresentations, and that Pinnacle's owners (the individual
Defendants) have been unjustly enriched as a result.

**ANALYSIS**

1.    <u>Standard of Review</u>.

The standards for summary judgment are well established.
Summary judgment is proper "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c). The party
opposing a properly supported summary judgment motion "'may not
rest upon the mere allegations or denials of his pleading, but
... must set forth specific facts showing that there is a genuine
issue for trial.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 248 (1986) (quoting <u>First Nat'l Bank of Arizona v. Cities
Serv. Co.</u>, 391 U.S. 253 (1968)). The Court is not duty bound to
search the entire record in an effort to establish a lack of
material facts. <u>Guarino v. Brookfield Township Trs.</u>, 980 F.2d
399, 404 (6th Cir. 1992); <u>InterRoyal Corp. v. Sponseller</u>, 889
F.2d 108, 111 (6th Cir. 1989), <u>cert. den.</u>, <u>Superior Roll Forming
Co. v. InterRoyal Corp.</u>, 494 U.S. 1091 (1990). Rather, the
burden is on the non-moving party to "present affirmative
evidence to defeat a properly supported motion for summary
judgment...," <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479-

-8-

80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of

-9-

the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations omitted).

2.    Choice of Law.

     Indiana law expressly applies to the independent contractor and waiver agreements at issue.  Under Ohio choice of law rules for tort actions, the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit.  Morgan v. Biro Mfg. Co., 15 Ohio St.3d 339, 342, 474 N.E.2d 286 (1984).  Cieminski asserts there is no significant difference between Ohio and Indiana law on the tort claims in this case.  Assuming that Cieminski's injury occurred in Ohio, the Court agrees that Ohio and Indiana law governing fraud and related tort claims is essentially the same.  The parties have briefed and argued Indiana law on these issues, and the Court will apply it to the remaining claims.

3.    Unjust Enrichment.

     The first count of the Amended Complaint is labeled "breach of contract/unjust enrichment."  While Cieminski has abandoned her contract claim concerning the Pinnacle sale, she argues that Defendants were unjustly enriched at her expense as a result of the sale.  It is undisputed that contracts between Cieminski and Pinnacle expressly governed the amount she would receive

-10-

from Pinnacle's sale.

Unjust enrichment is an equitable doctrine that does not apply when the relationship is governed by an express contract. See <u>Bayh v. Sonnenburg</u>, 573 N.E.2d 398, 409 (Ind. 1991); <u>Allgood v. GMC</u>, 2006 U.S. Dist. LEXIS 70764, at *108 (S.D. Ind., September 18, 2006): "It is well settled that a plaintiff may not pursue an action in *quantum meruit*, a remnant of chancery procedure, where the plaintiff has an adequate remedy at law." Cieminski abandoned her legal breach of contract claim based on the sale. Cieminski's claim of unjust enrichment cannot survive for that reason.

4. <u>Fraud</u>.

Cieminski contends that Flaugher fraudulently misrepresented to her that she would receive $3 million from the Pinnacle sale, when he knew that was false. She also contends that Flaugher misrepresented that Noble Energy would not continue in the Pinnacle business. She alleges Flaugher intended to induce her to obtain her customers' assignments of their contracts to BP.

"The elements of a claim of fraud include: 1) a material misrepresentation of a past or existing fact which, 2) was false, 3) was made with knowledge or in reckless ignorance of the falsity, 4) was relied upon by the complaining party, and 5) proximately caused the complaining party's injury. ... Actual fraud may not be based on representations of future conduct, on

broken promises, or on representations of existing intent that are not executed." Anderson v. Indianapolis Indiana AAMCO Dealers Advertising Pool, 678 N.E.2d 832, 839 (Ind. Ct. App. 1997) (internal citations omitted)

In Anderson, plaintiffs signed an advertising agreement required by their franchisor. They later alleged they were misled by defendant's statements about future benefits they would receive from the agreement. The court of appeals held that, even if the statements had been false and misleading, they did not support a fraud claim because they related to future conduct.

Flaugher's statement that Cieminski would receive $3 million if the sale to BP closed is a representation about a future event. And it was an event that Flaugher did not completely control, as Cieminski knew. She admitted he did not promise her $3 million or that the sale would definitely close. Even before she agreed to contact her customers about the assignments, Flaugher told her that she would receive $2.2 million, not $3 million. She was well aware that details of the sale transaction could change. (Cieminski Deposition p. 87:11-25)

Cieminski submitted an affidavit which attempts to undercut her testimony. She states that, while Flaugher did not use the word "promise" or "assure", ". . . he definitely did inform me that I would receive $3 million out of the sale." She states she was not interested in a deal "that would not compensate me

-12-

adequately." (Doc. 69, ¶8) A party may not contradict or embellish prior deposition testimony in order to avoid summary judgment. See Biechele v. Cedar Point, 747 F.2d 209, 215 (6th Cir. 1984). Cieminski's deposition testimony was plain: she admitted that Flaugher made her no promise. Her share of sale proceeds could only be determined, and paid, in the future and would depend upon the final negotiations between the three companies. Flaugher's statement about what she would receive in the future is not a representation of past or existing fact.

In Leung v. Haines, 2007 U.S. Dist. LEXIS 40782 (S.D. Ind., June 1, 2007), the district court dismissed a fraud claim arising out of a contractual relationship. The plaintiff alleged that defendant told him he would receive revenue of $307,283 if he entered into a business partnership with her. Plaintiff did so in reliance on that representation. He also alleged that defendant failed to provide him with complete financial information during the partnership, intending to induce him to continue in the business. The district court dismissed plaintiff's fraud claim under Rule 12(b)(6), because the representation about future earnings was a representation of a future event. The court noted that plaintiff's potential future earnings were clearly spelled out in the contract he signed, and the amounts he would actually receive depended upon work to be performed in the future.

The same is true here. Cieminski's December 10, 2004 contract entitled her to 10% of the Pinnacle sale proceeds. The precise amount of that 10% share was not known when Cieminski signed that contract, or in October 2005 when Flaugher told her she would receive $3 million.

Cieminski suggests that "justice" requires that she receive $3 million to reflect what she asserts was her real value to the company. Cieminski freely signed a contract entitling her to 10% of a to-be-determined sale price. She was not an equity owner of the company, and her independent contractor agreement was set to expire a few months after the sale. Her generalized arguments about "justice" do not support a viable fraud claim.

Cieminski also alleges that Flaugher told her that "Noble was no longer interested in participating in our line of business." (Cieminski Deposition p. 96) She contends this was also false and intended to mislead her. But as with the $3 million representation, a statement about what Noble may or may not be interested in doing in the future is not a representation of a past or existing fact. At best, Flaugher made a statement about a third party's intent about its own future course of conduct.

Moreover, Cieminski has not established a genuine dispute that the statement was in fact false. She did not ask anyone at Noble about this statement at the time. Her evidence of the

-14-

statement's falsity is limited to her own testimony about certain conversations she had with unidentified people at Noble in the spring of 2006, after she was terminated by BP.  These unidentified individuals led her to believe that she might have been able to maintain her customers' contracts with Noble after the BP sale, because Noble was still in business.  This sort of speculative evidence does not establish that Flaugher's statement was actually false at the time it was made.

Even assuming that Flaugher's statements were about past or existing facts, Cieminski lacks evidence of damages she sustained due to her reliance on either of Flaugher's statements.  She clearly believes she should have received far more from the Pinnacle sale.  She contends she would have been better off financially if she had kept her Pinnacle customers and arranged for a different gas supplier (or continued with the Noble supply contracts).  But she has no facts upon which a reasonable inference arises that any of this could have come to fruition. Fraud damages cannot be based upon an assumption that Cieminski necessarily would have been able to continue with her customers' contracts, and to receive the compensation she had been receiving, if Pinnacle and Noble were no longer involved in those contracts.

Cieminski cites City of Fort Wayne v. Capehart-Farnsworth Corp., 142 N.E.2d 442, 448 (Ind. App. 1957), where the court

-15-

noted that when a tortfeasor causes damage, "all doubts and
uncertainties as to the proof of the exact measure of damages
must be resolved against it."  In that case, a flooded sewer
completely destroyed a corporation's equipment and materials
stored in its basement.  The corporation presented evidence of
its material costs, and the fair market value of the equipment it
regularly sold, including specially-built products sold to
specific customers.  The tortfeasor argued that the evidence
failed to establish the fair market value of the damaged goods
immediately before <u>and</u> immediately after the flood, and also
failed to specifically account for potential depreciation.  The
Court of Appeals held that the corporation's evidence was
sufficient to support the trial court's damage verdict, and that
the technically precise measurement urged by the tortfeasor was
not required under the circumstances.

Here, Cieminski has no such specific evidence of her
reliance damages.  It is not enough to argue that she "should
have" received more, or that her "value" to Pinnacle justifies an
award of fraud damages.

5.    <u>Promissory Estoppel</u>.

Cieminski's opposition to Defendants' summary judgment
motion suggests (for the first time) that promissory estoppel or
constructive fraud may apply to her allegations.  She contends
that Flaugher promised her she would receive $3 million when

Pinnacle was sold, and that Defendants should be estopped from denying her that amount. The elements of a promissory estoppel claim are: (1) a promise, (2) made with the expectation that the promisee will rely thereon, (3) which induces reasonable reliance by the promise, (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise. Truck City of Gary, Inc. v. Schneider Nat. Leasing, 814 N.E.2d 273, 279 (Ind. App. 2004).

Cieminski's deposition testimony is clear that Flaugher made no actionable "promise" to her. And as discussed, Cieminski lacks evidence of her reasonable reliance damages that resulted from an alleged promise. Nor has she demonstrated how injustice would be avoided if the Court awarded her more than she bargained for when she signed the agreement to receive 10% of Pinnacle's eventual sale price.

Cieminski cites Nestor v. Kapetanovic, 573 N.E.2d 457 (Ind. Ct. App. 1991), a case involving a promise to make a will and a subsequent "constructive" fraud claim. There, a stepfather promised plaintiff he would make a will leaving everything to her, if she agreed not to claim against her deceased mother's estate. The stepfather failed to make the will, he and the plaintiff later had a falling out, and the stepfather later died intestate. The court of appeals noted that, unlike actual fraud, constructive fraud "may be based on promissory

-17-

misrepresentations; however, it must be shown that the promisee suffered a detriment and the promisor obtained some advantage." <u>Id</u>. at 459.  The plaintiff lacked evidence of a detriment, because her mother's assets were jointly owned with the stepfather, hence there was no "estate" against which she could have made a claim.

Assuming that Flaugher's statements were "promissory misrepresentations" (which the Court concludes they were not), Cieminski has not established a genuine factual dispute that she suffered a cognizable detriment by relying on those statements. She received 10% of Pinnacle's sale price, and she received and accepted an employment offer with BP.  Cieminski states that her BP contract turned out to be "worthless," but she does not deny that she received the benefit of the contract.  Nor does she suggest that Defendants were responsible for the eventual loss of those benefits.

The Court concludes that Defendants are entitled to summary judgment on Cieminski's tort claims, whether labeled actual or constructive fraud, or promissory estoppel.

6.   <u>Commission Claim</u>.

In her amended complaint, Cieminski alleges she is owed approximately $10,000 for unpaid commissions she earned in October 2005.  She also alleges, on information and belief, that she was "shorted" commissions over the entire term of her

-18-

contract with Pinnacle. (Am. Compl. ¶15) In her response to Defendants' summary judgment motion, she argues that her commissions were improperly calculated because "negative" amounts were deducted, in contravention of her contract.

Defendants argue that the "negative" deduction argument was not specifically alleged in her complaint. They also argue that Cieminski waived any and all commission claims when she signed the December 2004 "equity" letter agreement, and again later when she signed the December 2005 Waiver Agreement.

The 2004 equity letter states in this regard: "It is further understood that your entitlement to commission fees payable under [Cieminski's independent contractor agreement] shall also terminate upon completion of [Pinnacle's] acquisition or merger." Cieminski admits that this agreement contains a release, but she argues it only pertains to what she describes as "forward commissions." The letter agreement makes no such distinction; it applies to the "commission fees payable" under her contract.

Paragraph 1 of the December 2005 Waiver Agreement (quoted infra) states that upon the earlier of the closing of the Pinnacle sale or Cieminski's acceptance of BP's employment contract, the independent contractor agreement between Pinnacle and Cieminski shall terminate. The second sentence of that paragraph, a specific waiver of all defined "Forward

-19-

Commissions," is conditioned only on Cieminski's acceptance of BP's employment offer.  Thus the agreement clearly distinguishes between terminating her contractor agreement upon Pinnacle's sale, and her waiver of commission claims by accepting BP's offer.  She accepted that offer, and thereby waived her claims.

Cieminski argues, however, that the waiver agreement is invalid because it was obtained by fraud and duress, and violates Indiana public policy forbidding waivers of intentional tortious conduct.  The Court has already concluded that no fraudulent conduct took place.  As to "duress," Cieminski testified that she wanted to get "legal review" of the document before she signed it, and Flaugher told her that Pinnacle's corporate counsel had already reviewed it.  She also testified that she was "being somewhat harassed to get it signed and sent in and [being] told that I was slowing down the transaction for everybody." (Cieminski Deposition p. 170:14-19)  She does not contend that she did not understand the waiver agreement, or that anyone misrepresented its terms.  She also admits that she was represented by a lawyer at the time.

Duress is characterized as "the taking of undue advantage of the business or financial stress or extreme necessities or weaknesses of another, as contrasted with placing another in a difficult bargaining position or the pressure of financial circumstances. ...  Modern courts interpret duress as a

deprivation of the free exercise of the victim's own will, which may include economically-based duress. ... [M]ere threats, inconvenience, or delay do not constitute duress unless they truly subvert the victim's will." Hudson v. Indiana Limestone Co., 143 F.Supp.2d 1032, 1038 (S.D. Ind. 2001)(internal quotations and citations omitted).

The Court rejects Cieminski's argument that she was under "duress," as defined above, such that her waiver should be invalidated. Her free will was not subverted by the events preceding her execution of the waiver agreement or the BP employment contract. The release language in the waiver agreement is clear and needs no construction, as Cieminski suggests. She agreed to waive her commission claims if she accepted the BP employment contract. Her later dissatisfaction with that employment does not invalidate her decision to sign the waiver agreement.

Cieminski also argues that the waiver agreement is invalid for lack of consideration. She contends that there was nothing of value given to her, because Pinnacle's attorney had already negotiated the BP contract when she signed the waiver. Mr. Colucci, Pinnacle's corporate counsel, testified that the negotiations on the BP employment contracts started after the November 2005 letters of intent were in place. He states that the basic contract form was used for all the Pinnacle employees,

but that specific provisions on benefits and the amount of the retention bonus were individually negotiated. (Colucci Deposition at pp. 17-18 and 27-29) The BP contract which Cieminski signed is hardly "illusory" consideration; she was offered and accepted significant benefits. Cieminski seems to suggest that the consideration was illusory because she would make less at BP than she had made in "the free market" (presumably referring to her Pinnacle compensation). See Doc. 70 at p. 21. But a court should not inquire into the adequacy of the stated consideration, and even a slight benefit is sufficient. See, e.g., <u>Harrison-Floyd Farm Bureau Coop. Assoc., Inc. v. Reed</u>, 546 N.E.2d 855, 857 (Ind. App. 1989). Cieminski received the benefits of her BP contract; her subsequent dissatisfaction and the termination of that contract does not invalidate her acceptance of the waiver agreement, nor render the consideration illusory.

The Court rejects Cieminski's challenge to the waiver agreement, and concludes that she validly waived her claim to Pinnacle commissions when she signed the 2004 equity agreement, and specifically in the December 2005 waiver agreement.

## CONCLUSION

For all of the foregoing reasons, the Court grants Defendants' motion for summary judgment.

Neither party has sought entry of judgment on the

Defendants' counterclaim against Cieminski (Doc. 60), which alleges that Pinnacle "overpaid" Cieminski after the Pinnacle sale and seeks recoupment of that overpayment.  The counterclaim therefore remains pending for disposition.

     SO ORDERED.

Dated: February 20, 2008     <u>s/Sandra S. Beckwith</u>
                      Sandra S. Beckwith, Chief Judge
                     United States District Court